All rise. Thank you. Next case on today's docket is the case of in re custody of P.M.S. Senior and C.O.S. Minors versus Canvas P.W. And we have Mr. Hugh Heidman. Here. Cooper. And Ms. Paige Clark-Strong. Please record, counsel. We've sat and watched quite a bit this morning, afternoon now. And I would like to say that there won't be any fireworks between us. We're going to breathe fire on each other. And I would like to commend the post of counsel on the professional language you handle yourself at all times. Well, it's good to hear. Civility in this business is something that sometimes has changed over the years. My name's Keith Kepler, and I'm from Marion. And I represent the appellant, Phyllis Smith, who I will refer to, we believe, before as the father in this, to keep it simple. He is 38 years old, and he lives in Carbondale and works for Southern Illinois Health Care. More importantly, he is the father of two 11-year-old twins, a boy and a girl. I have made a typo in my brief somewhere in the brief when I said that their birth date is in June of 2015, which would be kind of impossible. It's 2005, and I apologize for that. The parties were together from 2004 until either 2009 or 2010, and they were not sure when they actually separated. The father filed a paternity case in the local court here. Father works day shift, which corresponded to the children's schooling. Mother works as a CNA at a local nursing home here in the Mount Vernon area. And most importantly for this case, factually, I believe, chose to work a night shift of 10 hours at a time, which caused her to leave the home during each shift at about 10.45 and to return home at 7.15 in the morning. The parties entered into a temporary order at the time the temporary order was entered. It was called temporary custody order. Of course, now we go by parenting time, and the agreement that they made that was ruled by the trial court to be in the best interest of the children was that the father would have the children after school on Fridays, every Friday, Friday night, Saturday, Saturday night, all day Sunday, and then return to a meeting place where the mother would then have the children Sunday night, Monday, Tuesday, Wednesday, Thursday, until the children, during this time period, boarded a bus to school. Later she would post her to a school, and the children would walk to school. And then after school, on a weekly basis, would go back to the father. At the time of trial, and for some time prior to the time of trial, trial was a two-day affair, by the way, mother was married to a convicted federal drug felon, and she lived five to six nights a week with a boyfriend. The boyfriend primarily took care of the children due to her work situation. I believe that's what the bystander's brief that the court put into the record shows. There was a woman that was referred to as the maternal grandmother, which was not actually a blood-relevant grandmother who cared for the children during the evening times when the mother would go to work two to three times a month. Father's time, when he worked and had the children, his work schedule directly coincided with the children's school time. And, of course, he was asking for the lion's share of parenting time in this, and had he received the parenting time, the evidence at trial was that his day shift would coincide with the schooling in Carbondale where he would have had the children. The paternal grandmother testified, which is in the bystander's brief, and she testified that she helped with the children and had a very good relationship with the children's father. Her son had a very good relationship with the children. They both testified that the father did all kinds of activities with the children, took them to the science museum, did leisure activities with them, did sports with them, helped them with their homework, and took them to church. The mother had a witness by the name of Donna Wright testify and said that the son was having increasing issues of acting out and that when that occurred, the son would often want to phone and talk to father and that he was refused the right to do that. That is on page 21 of the bystander's brief, paragraph 5. The mother's boyfriend testified that he did care for the children oftentimes when the mother was at work, and that he also testified, thankfully, that the father had a good relationship with the children. The GAL in this case, Jeanne Stitch, did a tremendous job, and this was commented on by the court. She did a tremendous job, the most thorough job of the GAL in my almost 37 years of practice of law. She didn't just participate in the trial and file a report. She filed three reports. She interviewed the children. She went to both homes in Mount Vernon and in Carbondale and interviewed the parties at their home and watched the children with the corresponding parent. She then also participated during the two days of trial. The children told her during every time she made contact with them that they wished to have primary parenting time, that's the legal phrase, that they wanted to live with the father. After interviewing witnesses, examining the homes, examining the children in each one of the homes, she filed the initial report saying that it was her recommendation that the father receive primary parenting time. One of the reasons why she said that, and she puts this in her first report, was that the children were guarded and cautious with the mother, that the children were chatty and relaxed with the father. It was also reported to her, as is indicated in her report, that the children were treated roughly in disciplined situations by the mother, and the children confirmed this to her. That dad, however, exhibiting a completely different style of parenting, took away privileges and did not speak negatively about the mother to the children. It's in the record from one-to-one time that that was not the same case that mother did speak. I recall that both parties spoke negatively of each other. It was reported by the children as well. During my time, when I come back, I'll have that for you. Okay. I think that part of—I was a little unclear what to do about this. Somewhere along the line in my practice, I had the impression that it was sort of off-limits what happened during, in Cameron, time with the investigation by the court to the children. However, they put this in the record. I purposely did not comment on it during my brief in chief. However, the mother did speak of it, and there were two places where the record shows that the father was spoken harshly about by the mother. One is during the Cameron conversation, and the boy told the judge that his mother called the father stupid. And then there is another indication someplace in the record where that occurs, and I right now don't recall that. I'm sorry. But it's in the judge's in-camera notes. The mother wished to have some other witnesses examined by the jail, and she did that. And then at C-47, she files a second report after talking to those witnesses, and in that report, she reaffirms her earlier position that the parenting time needed to go primarily to the father. And then she filed at C-49 through C—SC-56, a third report, in which she again recommends to the court that her earlier positions be affirmed by the court, that the father would have the majority of parenting time. And she specifically says in that that the mother chose to always work the night shift and that other people were raising the children in her home. The law on this is manifest weight. That's the burden, and we both agree on that on both of our briefs. The law on the point of this under this parenting statute is primarily just the parenting statute. You know, there's case law that says that the court doesn't have to rubber stamp the jail. Yeah, get that. That is what it says. There's case law that says that the court does not absolutely have to follow the children's desires. Of course not. But what this court has to do is to decide do the factors in the parenting statute, do they mean anything? When the trial court does not list any reasoning for its decision and simply makes a decision and doesn't really give a reason for it and doesn't comment on these factors, does the court simply give the trial court complete discretion, or does the trial court apply these to see if the manifest weight has been met or not? Underneath 602.7a and the best interests part of the statute, I believe that the father was more stable in his environment and more engaged with the children from a hands-on perspective. When he exercised his parenting time, when he had three days a week and she had four days a week, he is the one actually caring for the children with some help from his mother, but he's the one caring for them. During the four days that the mother had prior to the trial date, during those four days, every one of those four days, the mother was working 10 hours at a time. And she testified, and I don't think this was entirely believable. I don't think it was believable. She testified on Thursdays that she didn't sleep at all. She got home at 7.15 and she did not sleep at all. Well, I don't know how someone does that, at least at my age I don't. I don't know how anybody would go one day a week without sleeping, but that's what she testified. The children were raised more by her boyfriend, who was not her husband, and the woman she identified as grandmother, who is not a biological relative to the children, than by the mother. Now, you said the boyfriend had a felony conviction? No, the husband. Oh, the husband. The husband. And the husband had lived with the children and her up to some date, and I can get that. I think it's 2014. They had lived together, and then he went off to prison, and now he's out of prison. What was he charged with? Convicted, I'm sorry. It was a drug possession. I don't know what that was. And that wasn't in the record, so I don't know. Oh, it's not in the record? No, it's in the record that he was convicted of drug dealing. Okay, that's all I want. That's all I want. That's all I want. Okay. He also reported to the JAL that he had concerns from having lived with the mother and the children, with the mother's relationship with the children, and this is in one of the JAL reports, that the mother was subject to outbursts of anger and rough discipline with the children, and he had, I believe the phrase he used, safety concerns. There was also, through the JAL, a children's counselor in Carbondale who gave opinion that she was concerned about safety issues with the mother and about the mother's behavior. I believe that the concept of the Parenting Act now is to give as close to equal time as you can, and I believe that that is 602.7B, and it's certainly the way most of the cases that I've tried since the new Parenting Act has come out has been looked at by trial courts throughout Southern Illinois, and that's what they had before we went to trial. Without explanation, the court has gone from a half position with the children asking to live with Dad more, with the JAL and three reports saying that that's what should happen, with the child's counselor in Carbondale saying that she has concerns about safety, with the mother's current husband saying he has concerns about the children in her. The court basically stripped half the father's parenting time. Now, you've got to keep in mind here that Mount Vernon in Carbondale is about 110, 115 miles round trip back and forth from each other, and my client is working five days a week, day shift, and so just the transportation of what he was doing to make all this happen is really tremendous. Thank you for your argument. You'll have the opportunity to read that next time. Good afternoon. Good afternoon. May it please the Court, Counsel. In this case all along has reminded me of that little story you hear about blindfolded people feeling parts of an elephant and describing it. They all described what they felt, but none of those things related to each other at all, and when they took their blindfolds off they realized they were all talking about an elephant. That's exactly how this case is. If you listen to the facts that Mr. Kibler just told you, I can see why you might wonder how we ended up in this position. However, the trial court heard all the facts, not just these ones that he just told us about. He heard all of them. He heard them over two days. He heard both parties testify two times. He heard multiple witnesses. The guardian had likely participated in the trial. She did file three reports, and the judge did remark that she had done a great amount of work in filing her three reports. Why she filed three reports partly was there was a deadline to file a report, and she had not been able to reach everyone. Then, of course, the first report comes out and everybody gets all wound up and insists that more efforts be made to contact those people. That's why it kept extending on. That's why there were three done. All of those reports are in the record. You can look at them, and you will see exactly what the judge saw, that the GAL's opinion was based on her gut reaction of what she saw when the children were with their mother versus with their father. They were guarded with mother. They were not as guarded with father. That's not an applicable factor, and the factors that are in the statute were not applied by the GAL. So this judge, who was very familiar with the GAL's work and the fact that she had done so much, absolutely considered those three reports. He said so in his written order. He just chose to do something else. He also said in his written order that he did consider the children's opinions. He did. And I referenced the transcript in my statement of facts because it's vital to his decision that we don't have the children testify on the open. It doesn't mean that what they say doesn't matter. That's why we make a transcript of it. They did tell the judge that they wanted to live with their dad because they wanted to spend more time with him. They told some other things, too, none of which were horrendous or terribly slanted one way or the other. They just wanted to spend more time with dad. The judge considered that. He didn't choose to make that his controlling factor, obviously, but his order indicates that he did consider it. And that's his job, to consider every single one of the factors. Now, one thing that we didn't talk about yet is that what was referenced by Mr. Kibler is that the order in this case is relatively short. It is. It doesn't say, I decided this because I found this factor. But there's no rule that says he has to do that. What the rule is is that there has to be something in the record to support the decision that he made. In order to find that this decision was against the manifest weight of the evidence, you have to find that the exact opposite conclusion is what absolutely should have happened, that there's no question there. And you just can't do that when you read this bystanders report. What you will see is not that someone else raised these children while Candace worked. What you will see is that Candace worked Thursday night, Friday night, Wednesday night, Thursday night, Friday night, Saturday night, after her children went to bed and was home either before they woke up or around about the same time. So she's not the same time with her children. She included Friday night and Saturday nights in her work schedule on purpose because her children spend the weekends with their father. So she wasn't missing any time with him either. There was a mention of a temporary order that they spent every weekend with him. There was a temporary order entered in 2014, but this has gone on for years. This has always been their arrangement that the children had been with him every weekend. That wasn't a new thing that we had to fight about. That's what the parties had agreed to do for years. Mr. Kibler also mentioned that if the children were with their father full time, that he would be available to take care of them, not pawn them off on someone else, because he worked the day shift. I believe the testimony was that he worked from 7 a.m. until 3 p.m., so his mom would have to get the kids to school. That's no different than what's going on in Candace's house. Not at all. And the bystander's report will show that. Dad did testify that he did do some activities with his kids. Sometimes he went to church with them. He would take them to the museum. They went to the science center. I think he said that they went on walks. One thing he notably didn't do is ever go to the doctor with them, ever go to a school activity, ever go to anything he was invited to if Candace was the one who invited him, such as a birthday party or a Father's Day event at the church that the kids wanted him to attend. He didn't go to any of those things, and he specifically testified to the judge that he didn't because he didn't want to. Those are the factors you need to look for in this bystander's report. Those are the things that the judge heard when he was considering every single factor in this case, not just a few, but every single one of them. When you consider all of the facts that are included in the bystander's report, you will see that there's nothing odd about this decision at all. Candace has raised these children essentially on her own since she and Philip split up. He saw them every weekend, but she did the hard part. She did the heavy lifting. She took them to the doctor, and both of her children have special needs. They were at the doctor. They were at school. She knew that her daughter played the clarinet while Dad thought she played the flute. He complained that the children weren't in any sports or extracurricular activities, but they participated in cross-country. The daughter participated in cross-country. The little boy wasn't interested. That's all part of what they told the judge. What the father demonstrated in this case isn't that the manifest way of the evidence is in his favor, but it is that he has allowed Candace to parent these children all of these years because that's what suits him, and he will not communicate with her in a civil manner. He refuses to speak to her. That's in the vice manager's report. He will not do anything to help because it's not his job. He is more focused on proving that she's a bad mother than co-parenting with her. Unfortunately, because she does it every day of the week, she does a pretty good job of it, and I do need to correct that. There's not a four-day, three-day arrangement. It's Friday evening about 5 or 6 until Sunday. That's 48 hours, and I know we all go to law school because we're bad at math, but I've figured that out several times. That's two days. There's no reason to change from that. It is true that the judge did take away every single weekend and only offered alternating weekends and a Wednesday evening. He did do that. He did that with full information in front of him, having listened to this testimony, having read the GAO reports, having considered every factor he was supposed to consider, and there's absolutely nothing manifestly wrong with that decision. For that reason, we would ask that this court affirm the court order entered by the trial judge and let these children continue their life as they've been ordered to do so. Are there any questions? Thank you. Thank you. Thank you. To try and answer the court's decision with what I can get my hands on while I was sitting there. You didn't talk as long as you normally do. I didn't have as much time. Record page 222, line 15. The mother told the children that if they went to live with the father, she would only be able to see them when the police officer was present and that they would not be able to visit with their half-siblings. The father did not say those type of things to the children or do those things. And then referring to the in-camera presentation, the mother, the boy testified to the best of my memory, and I'm doing this by memory. The boy told the trial court that the mother called her father stupid. And then when asked another question by the judge, the son said, well, I think he was just funny, whatever that means. And so those are the two comments that I could come up with from what you asked me. The birthday party incident was a birthday party with the mother for the twins and her immediate circle of people. And the father testified that he chose to do his own birthday party once he had the children and could do it with his family, and that's what he did. The Father's Day thing at church that counsel referred to, and the record will say that that was a one-off thing, that the children did not attend that church, that they went to that church for the purpose of a Father's Day activity, and that the father did not feel comfortable going to that and chose to spend his time with the children by Father's Day himself. There is absolutely no doubt in this record that this mother and father did not get along very well. I think that's clear. I do note that you made a statement about her prior husband being convicted and serving time. I read in a bystander report that there was also a conviction of the father for drug possession. I believe it was misdemeanor marijuana 12 years prior. I don't know. It doesn't state that. It just says the court noted. Will that be in the record, that it was the misdemeanor marijuana charge? I'm not positive, but I think it's in one of the jail reports. Okay. There was absolutely nothing current. The way the bystander's report was done in this case procedurally, and I'll get into my five minutes here, it was, for me, very different. We showed up for trial, and there was no court reporter available. And we had a problem getting this trial in because of school starting, and my client, wanting primary parenting time, needed to get the case over with to move the children to Carbondale to start school there. And without a court reporter available for whatever reason that day in the circuit court down the road here, we were left with the court telling us that he was going to make copious notes. And I put that in the affidavit on the bystander's report. And not knowing exactly what that meant, I actually said, copious notes? And he goes, copious notes. I said, okay. So we tried it on that representation, and then after we got the court's decision, I filed the appeal, and I noticed when I got the record appeal that those notes were not in the record. And perhaps I just clearly misunderstood what the judge's intent was, because I know oftentimes they don't, you know, you don't include your, the trial court doesn't include your notes in it. But I don't know why the court would have said that. Perhaps I just misunderstood, but I believe that he was the one who included those notes. So he got back to me and said he was not going to include those notes. He considered those personal. So I filed a bystander's report, an application for a bystander's report, sent it to the parties back at the trial court. And the time went by, and no one objected. And then I received a phone call, and I believe this is in my, when I filed the motion to include the judge's bystander's report, I received a phone call from the judge and said that if I would pay the court reporter, he would make his own bystander's report. Well, I didn't know what to do about that, so I just said okay. And I sent, put whatever amount he put, told me. I said, check that day. And then he produced the bystander's report. But I wasn't allowed to comment on it or do anything with it. That's just kind of the way that worked. And I've never actually seen that occur before. And sometimes. I thought the way it worked is you both have the opportunity to submit your own version, and if you can't agree to it, then the judge kind of mediates it. Well, that's not how that happened. Well, I mean, did you ask to, did you submit a bystander's report? Oh, yes, ma'am. I'm sorry. Okay. I said that a minute ago. I'm sorry. This all started by when I asked. Well, yeah. When I, when I, I did my own bystander's report when the court didn't do anything with the copious notes. And the time went by, nobody objected to it. He didn't sign the order. And then I got a phone call from the court saying if I would pay the court reporter, I guess for his typing his thing, because there wasn't a court reporter in the proceeding. I sent a check that day to the court reporter. Did you know what you were paying the court reporter for? I assumed it was for typing up whatever the court was doing. And I'm not alleging some kind of mis, I'm just misbehavior on the part. Right, right. I'm just trying to clarify what's unusual. It was unusual. I'm a gentleman. I really tried to be a gentleman. And I really liked the cop report. So I wasn't going to argue with him. I just did what he told me. And that's, that's the way that happened. Okay. Bottom line, none of these people could afford a jail. The jail's still not been paid. Notice the jail's not here. Why have one? And why put the statute in there about the children if they're really not going to have any effect on what they're doing? Getting divorced under this parenting plan, the parenting plan and all the stuff that has to go through it, is too expensive for the poor people that live here. It is. It just is. And there's no reason to have a statute if the statute's not followed. Thank you. Thank you. Thank you both for your arguments and briefs. And we'll take them out under advisement and under a warning before we're going to stand. Recess until 145. All rise.